UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

DELOACH MARINE SERVICES, LLC                    CIVIL ACTION

VERSUS                                                            NO. 17-2970

MARQUETTE TRANSPORTATION                     SECTION "R" (3)
COMPANY, LLC


**FINDINGS OF FACT AND CONCLUSIONS OF LAW**


I.    **INTRODUCTION**

      This case arises out of a collision between the M/V VANPORT, a vessel

owned by plaintiff Deloach Marine Services, and the M/V JUSTIN PAUL

ECKSTEIN (JUSTIN), a vessel owned by defendant Marquette

Transportation Company.[1]    The collision resulted in damages to the

VANPORT's cargo in the amount of $1,172,739.30.[2]  Plaintiff paid the owner

of the cargo the full loss amount in exchange for a release of claims against it

and took an assignment of the owner's claim to recover the loss from

defendant.[3]   On April 6, 2017, plaintiff filed a lawsuit in this Court seeking

damages and contribution.[4]  Plaintiff alleges that the collision was caused by

---

[1]    R. Doc. 1 at 2 ¶ 4.
[2]    *Id.* at 4 ¶ 9.
[3]    *Id.* ¶ 10.
[4]    *See generally id.*

defendant's negligence through its employee, the captain of the JUSTIN.[5] Defendant denies that it was negligent and counterclaims that the plaintiff, through its employee, the captain of the VANPORT, was contributorily negligent.[6]

On February 11 and 12, 2019, the Court held a bench trial. The Court has jurisdiction over this matter under 28 U.S.C. § 1333. After hearing live testimony and reviewing all the evidence presented by the capable and experienced maritime lawyers on each side, the Court rules as follows.

## II. FINDINGS OF FACT AND CONCLUSIONS OF LAW

### A. Background

At trial, Billy Jackson, captain of the JUSTIN, testified that on January 26, 2016, shortly before 1:00 p.m., the JUSTIN was on the right descending bank of the Mississippi River, near mile marker 131, with six barges in tow.[7] The JUSTIN was directly behind the CGB LaPlace fleeting facility, a barge storage area.[8] Captain Jackson wanted to "flip off" of the river bank and "top around" the JUSTIN, which involved turning the ship around to face the

---

[5]    *Id.* at 3 ¶ 7.
[6]    R. Doc. 5 at 4-5.
[7]    Testimony of Billy Jackson; Joint Exhibit 41.
[8]    Joint Exhibit 41; Testimony of Matthew Vidrine.

opposite direction.[9]  As was his practice, Captain Jackson made a security call to all vessels in the area alerting them of his intention.[10]  Captain Jackson stated over the vessel radio at 12:49p.m., "JUSTIN PAUL ECKSTEIN.  Going to be delivering six loads around bottom of the CGB Laplace off the west bank.  Turn around heading south."[11]  At the time of Captain Jackson's call, Matthew Vidrine, the captain of the VANPORT, was near Bonnet Carré Point proceeding down river with four barges in tow.[12]  Captain Vidrine testified that he heard Captain Jackson's radio message, but that he did not feel an obligation to respond, because Captain Jackson's message was merely alerting all boat traffic of his intention.[13]

Ten minutes earlier, at 12:39p.m., Captain Vidrine had made a passing agreement with a large, oceangoing ship the BEATRICE, which was also travelling downriver.  He stated over the radio, "I wouldn't mind getting you by me . . . I'll pull it back and float."[14]  The two captains agreed that the BEATRICE would pass the VANPORT on the VANPORT's port side.[15]  The

---

[9]      Testimony of Billy Jackson.
[10]     *Id.*
[11]     Joint Exhibit 7.
[12]     Joint Exhibit 4.
[13]     Testimony of Matthew Vidrine.
[14]     Joint Exhibit 7.
[15]     *Id.*

BEATRICE therefore asked the VANPORT to "favor the barge fleet."[16] Captain Vidrine understood that he had to stay close to the CGB Laplace fleet on the right descending bank so that the BEATRICE, a large vessel, could travel in the deepest part of the river channel.[17] The BEATRICE also needed to travel closer than it usually would to the right side of the channel, because the BEATRICE had a second passing agreement with a vessel moving upriver, in which the BEATRICE agreed stay to the right and let the vessel pass on its port side.[18] Finally, a strong river current was pushing the VANPORT quickly downriver and toward the left descending bank. Thus, Captain Vidrine had to turn toward the right descending bank to fight the current.[19] For all of these reasons, the VANPORT was required to travel as close to the right edge of the channel as possible. Captain Vidrine testified that, after he made the agreement with the BEATRICE, he put the vessel in idle[20] and turned the VANPORT toward the right descending bank.[21] He then continued down river as the BEATRICE began to overtake him.[22]

---

16    *Id.*
17    Testimony of Matthew Vidrine.
18    *Id.*
19    Testimony of Samuel Schropp.
20    Testimony of Matthew Vidrine.
21    *Id.*
22    *Id.*

At 12:54p.m. Captain Jackson made a radio call to the VANPORT and initiated the following exchange:

> JUSTIN: I straightened her up there with all the traffic coming. I think you're down far enough now that I can go ahead and start letting her spin.
>
> VANPORT: Yeah, you sure can. I'm just slowed down to get this ship by me . . . .
>
> JUSTIN: Yeah, seeing as how I'm going to be about abreast here and I got her crossways, I didn't want to have my head stuck out there in nobody's way.
>
> VANPORT: I appreciate it. I saw that, but I had confidence.[23]

Captain Vidrine testified that he understood this conversation to mean that the JUSTIN would wait for him to pass and top around behind him.[24] He testified that the JUSTIN had to straighten up to avoid "all this traffic coming," *i.e.*, vessels such as the BEATRICE and the VANPORT.[25] "Straightened her up" meant that the JUSTIN had pulled back against the bank behind the fleet, out of the navigational channel of the river.[26] Captain Vidrine therefore understood Captain Jackson to be telling him that the JUSTIN was out of the navigational channel, and that it would stay

---

[23]    Joint Exhibit 7.
[24]    Testimony of Matthew Vidrine.
[25]    *Id.*
[26]    *Id.*

underneath the fleet and out of the navigational channel until the VANPORT had safely passed.[27] Captain Vidrine testified that he agreed that the JUSTIN could "start or prepare for his spin," because he thought he was giving permission for the JUSTIN to "spin in behind [the VANPORT] and fall in behind [it]."[28] He did not know how long it would take the JUSTIN, with the cargo it was carrying, to execute the top around maneuver.[29] Indeed, such a calculation would have been nearly impossible, because Captain Vidrine could see the JUSTIN only in his Rose Point display.[30] This display did not include an image of the JUSTIN's tow.[31] Captain Vidrine therefore did not have access to information required to calculate the speed at which the JUSTIN would turn when he gave permission for it to begin turning.

Conversely, Captain Jackson interpreted the exchange between the VANPORT and the JUSTIN as creating an agreement in which the VANPORT would stay clear of the JUSTIN while the JUSTIN executed the

---

[27]     *Id.*

[28]     *Id.*

[29]     *Id.*

[30]     Rose Point is a marine navigation software program that allows vessel captains to see their vessel's trajectory as well as the position of other vessels near them. *See Marquette Transp. Co., LLC v. M/V Century Dream*, No. 16-522, 2017 WL 677814, at *2 (E.D. La. Feb. 21, 2017) (referring to the Rose Point navigational system as "the industry standard" that "automatically and objectively record[s] vessel location and movement on a proven industry standard electronic chart").

[31]     Testimony of Samuel Schropp.

top around maneuver ahead of the VANPORT.[32]   Captain Jackson understood Captain Vidrine's statement, "yeah, you sure can," as permission to do the top around maneuver immediately.[33]   He therefore proceeded immediately to begin topping around.[34]   Captain Jackson testified that he thought he had room to top around in front of the VANPORT in part due to Captain Vidrine's statement that the VANPORT had "cut back" its speed for the BEATRICE.[35]   He expected the VANPORT to continue running at reduced speed because that was "what we had talked about when we made the agreement."[36]

The Court credits both captains' testimony and finds that they had two conflicting interpretations of the radio exchange. It also finds that the differing understandings of the radio exchange led the captains to proceed into the same spot in the river at the same time, each thinking that the other vessel would stay clear.

### B.    The Collision

The Rose Point data from the two vessels shows that after the radio exchange, the VANPORT continued an essentially straight course along the

---

[32]    Testimony of Billy Jackson.
[33]    *Id.*
[34]    *Id.*
[35]    *Id.*
[36]    *Id.*

edge of the navigational channel, hugging the fleet along the right descending bank.[37]  The JUSTIN pulled out from the bank and began to top around in the VANPORT's path.  The BEATRICE reached the VANPORT at approximately 12:56p.m., travelling in the middle of the channel on the VANPORT's port side.[38]  The VANPORT could not turn toward the middle of the river until the BEATRICE had safely passed.  The VANPORT's black box CCTV footage shows that the BEATRICE did not clear the front end of the VANPORT until 12:58, about one minute before the collision.[39]

Just as the BEATRICE was clear, the Rose Point data shows that the VANPORT began to steer hard to port, away from the JUSTIN.[40]  Captain Vidrine testified that he realized the JUSTIN was turning into his path at the same moment that the BEATRICE finished passing the VANPORT.[41]  He immediately took the vessel out of idle and turned toward the center of the channel, away from the JUSTIN.[42]  Captain Vidrine radioed the JUSTIN at this point, stating, "I hope you're backing down."[43]   Captain Jackson

---

[37]  Joint Exhibit 2; Joint Exhibit 4.
[38]  Joint Exhibit 40.
[39]  Joint Exhibit 5.
[40]  Joint Exhibit 4; Testimony of Samuel Schropp.
[41]  Testimony of Matthew Vidrine.
[42]  *Id.*
[43]  Joint Exhibit 7.

responded, "Roger, roger, I'm backing away from you."[44]  But by the time Captain Vidrine appreciated the risk of collision and communicated it to the JUSTIN, the vessels could not move out of each other's way quickly enough to avoid a collision.

The vessels collided just before 12:59p.m.[45]  The JUSTIN's tow hit the side of the lead barge of the VANPORT's tow.[46]  After the collision, Captain Jackson stated over the radio, "that's why I asked you whether you thought it would be all right for me to go ahead and start turning . . . I ain't but six foot off the bank."[47]  Captain Vidrine said nothing further over the radio.[48]

### C.    Damages

As a result of the collision, Ingram, the owner of the VANPORT's cargo, incurred damages in the amount of $1,172,739.30.[49]  Plaintiff reimbursed Ingram for the full amount of this loss and took an assignment of Ingram's claim to recover the loss from defendant.[50]

---

[44]     *Id.*
[45]     Joint Exhibit 2, Joint Exhibit 4, Testimony of Samuel Schropp.
[46]     Testimony of Matthew Vidrine.
[47]     Joint Exhibit 7.
[48]     *Id.*
[49]     Joint Exhibit 15 at 1.
[50]     *Id.* at 2-3.

### D. Maritime Negligence

Plaintiff argues that defendant, through its employee Captain Jackson, negligently caused its damages by: (1) performing the top around maneuver before the VANPORT, as the ship with the right of way, had passed; and (2) violating Rule 2, Rule 5, Rule 7, and Rule 14 of the Inland Navigation Rules.[51] Defendant responds that it was not negligent, and that Captain Vidrine was negligent in: (1) violating Rule 2, Rule 5, Rule 6, Rule 7, Rule 8, and Rule 14 of the Inland Navigation Rules; and (2) violating industry custom or practice of abiding by top around agreements.[52] The Court addresses the parties' arguments in three parts: (1) negligence under the requirement that seamen take reasonable care, (2) negligence under the Pennsylvania Rule; and (3) negligence in violating an industry custom or practice.

#### 1. Failure to Take Reasonable Care

"To establish maritime negligence, a plaintiff must 'demonstrate that there was a duty owed by the defendant to the plaintiff, breach of that duty, injury sustained by [the] plaintiff, and a causal connection between the defendant's conduct and the plaintiff's injury.'" *Canal Barge Co. v. Torco Oil Co.*, 220 F.3d 370, 376 (5th Cir. 2000) (quoting *In re Cooper/T. Smith*, 929

---

[51]    R. Doc. 41.
[52]    R. Doc. 37; Testimony of Gregory Smith.

F.2d 1073, 1077 (5th Cir. 1991)). "Even without a statutory violation, liability may be imposed simply where there is negligence." *Stolt Achievement, Ltd. v. Dredge B.E. LINDHOLM*, 447 F.3d 360, 364 (5th Cir. 2006); *see also Movible Offshore, Inc. v. M/V Wilken A. Falgout*, 471 F.2d 268, 274 (5th Cir. 1973) ("It is enough that the vessel sought to be charged had at its disposal safe means to avoid the collision and *negligently* failed to do so." (emphasis in original)). "The applicable standards of care in a collision case stem from the traditional concepts of prudent seamanship and reasonable care . . . ." *Stolt*, 447 F.3d at 364; *see also Folkstone Mar., Ltd. v. CSX Corp.*, 64 F.3d 1037, 1046 (7th Cir. 1995) (holding that seamen have a duty to take "reasonable care under the circumstances").

The Court determines that both captains failed to adhere to a standard of reasonable care under the circumstances, but that defendant was more at fault than plaintiff. First, the JUSTIN's decision to perform the top around maneuver in front of oncoming traffic created the unsafe circumstances that led to the collision. Both parties agree that the VANPORT had the right of way as the downbound vessel.[53] Captain Jackson testified that he heard the VANPORT make its passing agreement with the BEATRICE.[54] Knowing that

---

[53]     Testimony of Matthew Vidrine; Testimony of Billy Jackson.
[54]     Testimony of Billy Jackson.

the VANPORT would soon pass by very close to where he intended to perform the top around maneuver, the JUSTIN should have waited until the channel was clear before topping around. Indeed, the Fifth Circuit has recognized that a party is negligent if it fails to yield to boat traffic with the right of way, especially when that party sets in motion a course of events resulting in a collision. *Union Oil Co. of Cal. v. Tug Mary Malloy*, 414 F.2d 669, 673 (5th Cir. 1969) (upholding trial court's assignment of full liability to defendant because its "failure to yield the right-of-way can properly be described as that cause which necessarily sets the other cause or causes in operation in a natural and continuous sequence" (quotation marks omitted)). The JUSTIN bears primary responsibility for creating a dangerous situation in which the VANPORT, already pushed to the side of the channel by the BEATRICE, was forced to thread a needle between two other vessels.

Second, the JUSTIN was negligent in failing to clearly communicate its intent to turn in front of, rather than behind or to the side of, the VANPORT. When Captain Jackson made his security call alerting other traffic of his intention to top around, he stated only that he was "[g]oing to be delivering six loads around bottom of the CGB Laplace off the west bank" and that he

would "turn around heading south."[55]  When he spoke to the VANPORT directly, he stated, "I think you're down far enough now that I can go ahead and start letting her spin."[56]  Neither communication gave any indication of where, in relation to other vessels, the JUSTIN intended to top around.  If anything, the phrase "I think you're down far enough now" indicated that the JUSTIN intended to top around behind the VANPORT, rather than in front of it.  The JUSTIN had an obligation, as the vessel moving out into the channel in front of downbound boat traffic, to clearly communicate its intentions.  The VANPORT reasonably assumed, given that the JUSTIN had a duty to yield, that the JUSTIN planned to turn behind it.  It was therefore the JUSTIN's duty to communicate that it intended to turn in front.  The security call and exchange with the VANPORT did not adequately convey this intent to reverse the typical right-of-way pattern.  The JUSTIN was therefore negligent in failing to clearly articulate its intention.

But the VANPORT was negligent in agreeing over the radio that the JUSTIN could begin the top around maneuver before the VANPORT had safely passed the JUSTIN.  The VANPORT was favoring the right descending bank, and Captain Vidrine could see on the vessel's Rose Point display that

---

[55]    Joint Exhibit 7.

[56]    *Id.*

the JUSTIN was also along the right descending bank. Even if he reasonably assumed, based on Captain Jackson's use of the phrase, "I think you're down far enough," that the JUSTIN sought to top around behind the VANPORT, Captain Vidrine should have known that it was too early for the JUSTIN to begin its turn. The VANPORT was a mile upriver of the JUSTIN during their radio exchange.[57] While Captain Jackson was best positioned to know the speed at which the JUSTIN would turn, Captain Vidrine could still determine that the JUSTIN's tow likely would be pulled into the channel before the VANPORT passed the JUSTIN, based on the swift current. Even taking the VANPORT's assumption that the JUSTIN would top around behind it as reasonable, the VANPORT was negligent in agreeing that the JUSTIN could start turning before the VANPORT was clear. At a minimum, the VANPORT should have added a qualifier along the lines of, 'as long as you stay clear until I am past you,' to its assent.

Defendant's expert testified that the JUSTIN's decision to top around was not negligent because there was room for all three vessels to safely pass in that stretch of river.[58] The Court does not credit this testimony because Captain Vidrine testified that passing closer to the BEATRICE would have

---

[57]    Testimony of Billy Jackson.
[58]    Testimony of Gregory Smith.

14

been "risky," and that he would not have felt comfortable with it, even though it would have been physically possible.[59]  In addition, plaintiff's expert gave a conflicting calculation of the distance between the VANPORT and the BEATRICE in the minutes before the collision,[60] indicating that there would not have been room for all three vessels to pass.  At the very least, the risk of collision increased with the addition of a third vessel simultaneously passing through the same stretch of river as the VANPORT, its tow, and the BEATRICE.  A prudent seaman under these circumstances would therefore have waited until the ships passed, and there was no longer such a risk.

Defendant's witnesses also testified that the JUSTIN was not negligent because the JUSTIN was behind the fleet and outside of the navigational channel before and during the collision.[61]  Captain Jackson and defendant's expert testified that the VANPORT caused the collision by travelling outside of the navigational channel.[62]  The Court does not credit this testimony, because neither party presented sufficient, reliable evidence on the location of the channel's border.  Indeed, multiple witnesses agreed that they were not able to identify the exact edges of the navigational channel.[63]  Captain

---

[59]     Testimony of Matthew Vidrine.
[60]     Testimony of Samuel Schropp.
[61]     Testimony of Gregory Smith.
[62]     *Id.*
[63]     Testimony of Matthew Vidrine; Testimony of Billy Jackson.

Vidrine testified that he was in the channel at the time of the collision.[64]  The Court therefore cannot determine whether the VANPORT was slightly inside or slightly outside of the navigational channel leading up to the accident or at the time of the accident.  Accordingly, the Court finds that the VANPORT did not negligently travel outside of the channel.

Defendant also argued that the VANPORT negligently turned toward the JUSTIN and negligently increased its speed after telling the JUSTIN that it was traveling slowly.[65]  The Court does not credit the testimony that the VANPORT negligently turned toward the JUSTIN or negligently increased its speed, because Captain Vidrine and plaintiff's expert credibly testified that the current was very strong on the day of the collision.[66]  Captain Vidrine testified that the VANPORT was in idle until only a minute before the collision.[67]  The Court therefore finds that the VANPORT's increased speed was due to an increased river current, rather than intervention by Captain Vidrine.  Similarly, the VANPORT turned toward the JUSTIN only because the current was pushing the VANPORT toward the opposite bank.[68]  Captain Vidrine had to angle the vessel toward the right descending bank in order to

---

[64]     Testimony of Matthew Vidrine.
[65]     Testimony of Billy Jackson, Testimony of Gregory Smith.
[66]     Testimony of Matthew Vidrine; Testimony of Samuel Schropp.
[67]     Testimony of Matthew Vidrine.
[68]     Testimony of Matthew Vidrine; Testimony of Samuel Schropp.

maintain a straight path.[69]  Finally, even if the VANPORT had sped up,

Captain Vidrine made no representations to the JUSTIN that he would

continue to idle or slow down.  He stated only that, he was "just slowed down

to get this ship by me."[70]  The word "just" implies that Captain Vidrine had

slowed only temporarily.  Therefore, it was unreasonable for Captain Jackson

to interpret Captain Vidrine's statements as a pronouncement that he would

continue to travel slowly.  Accordingly, the VANPORT did not behave

negligently by turning toward the JUSTIN, nor did it negligently increase its

speed.

### 2.  Negligence under the Pennsylvania Rule

In *The Pennsylvania*, 86 U.S. 125 (1873), the Supreme Court held that,

> when . . . a ship at the time of a collision is in actual violation of
> a statutory rule intended to prevent collisions, it is no more than
> a reasonable presumption that the fault, if not the sole cause, was
> at least a contributory cause of the disaster. In such a case the
> burden rests upon the ship of showing not merely that her fault
> might not have been one of the causes, or that it probably was
> not, but that it could not have been.

*Id.* at 136.  Thus, when a court determines that a party has violated a statute

or rule, the burden then rests on the violator to prove that it was not at fault.

*See Pennzoil Producing Co. v. Offshore Express*, 943 F.2d 1465, 1472 (5th

---

[69]    *Id.*
[70]    Joint Exhibit 7.

Cir. 1991). But the Pennsylvania Rule is not "a hard and fast rule that every vessel guilty of a statutory fault has the burden of establishing that its fault could not by any stretch of the imagination have had any causal relation to the collision, no matter how speculative, improbable, or remote." *In re Mid-S. Towing Co.*, 418 F.3d 526, 534 (5th Cir. 2005) (quoting *Compania De Maderas De Caibarien v. The Queenston Heights*, 220 F .2d 120, 122-23 (5th Cir. 1955)). If a violation was not "a contributory and proximate cause of the damages sustained," the Court need not find a party at fault even when they violated a statute or rule. *Id.*

The Court finds that both captains violated Rule 2, and that these violations caused the collision. Rule 2 provides, "[n]othing in these Rules shall exonerate any vessel, or the owner, master, or crew thereof, from the consequences of any neglect to comply with these Rules or of the neglect of any precaution which may be required by the ordinary practice of seamen, or by the special circumstances of the case." 33 C.F.R. § 83.02. As already discussed, the JUSTIN violated the ordinary practice of seamen when it failed to yield to oncoming vessel traffic and attempted to execute a maneuver that was risky under the circumstances, as well as when it failed to clearly express its intention to travel in front of the VANPORT. The VANPORT violated the ordinary practice of seamen when it gave permission

for the VANPORT to begin to top around in an unsafe location.  But because the JUSTIN created the unsafe situation, its Captain gave an ambiguous statement of what he intended, and because the JUSTIN was in a better position to evaluate how quickly it would execute the top around maneuver, the JUSTIN bears more fault.

The Court also finds that the JUSTIN, but not the VANPORT, violated Rule 14(d).  A head on situation, in which one vessel is travelling upstream and the other downstream, is governed by Rule 14(d). The Rule provides, "a power-driven vessel . . . proceeding downbound with a following current shall have the right-of-way over an upbound vessel, [and] shall propose the manner of passage."  33 C.F.R. § 83.14.  The VANPORT had the right of way as the vessel moving downriver.  The JUSTIN violated Rule 14(d) when it performed the top around maneuver in front of the VANPORT, the vessel with the right of way.  Captain Jackson acknowledged that the VANPORT and other vessels were going to be "about abreast here and I got her crossways."[71]  If the downbound vessels had the right of way, the JUSTIN should have waited until they passed and the river was clear to perform the top around.

---

[71]     Joint Exhibit 7.

Defendant argues that the VANPORT also had an obligation under Rule 14(d) to propose a manner of safe passage after it received the JUSTIN's radio call.[72] But the VANPORT had no obligation to propose a safe manner of passage, because the JUSTIN never indicated its intention to turn in front of the VANPORT. As discussed, it was reasonable for the VANPORT to understand that the JUSTIN would turn behind it, based on Captain Jackson's language and the JUSTIN's obligation to yield under the Rule 14. The VANPORT had no obligation to propose a safe manner of passage until it had notice that the JUSTIN was planning to move in front of it.[73] Captain Jackson's security call and exchange with the VANPORT do not constitute notice, because neither communication included any indication that the JUSTIN would proceed in front of the VANPORT. The Court found that it was reasonable for Captain Vidrine to understand that the JUSTIN would turn behind the VANPORT, even after his discussion with Captain Jackson. Thus, the VANPORT did not have appropriate notice that the JUSTIN would turn in front of it, and it therefore had no obligation to propose a safe manner of passage under Rule 14.

---

[72]     Testimony of Gregory Smith.
[73]     Testimony of Billy Jackson.

Finally, the parties' arguments under Rules 5, 6, 7, and 8 are predicated on which captain had the proper understanding of how to proceed, based on his interpretation of the captains' radio exchange. Accordingly, the parties' violations of these rules do not change the Court's analysis. The Court has already determined that Captain Jackson was negligent in starting to perform the top around maneuver, and that Captain Vidrine should not have allowed the JUSTIN to start its turn before the VANPORT had passed.

Rule 5 provides that captains have an obligation to, "at all times maintain a proper look-out . . . so as to make a full appraisal of . . . the risk of collision." 33 C.F.R. § 83.05. Rule 6 provides that vessels must "at all times proceed at a safe speed." 33 C.F.R. § 83.06. Rule 7 provides that captains must use "all available means . . . to determine if risk of collision exists." 33 C.F.R. § 83.07. Rule 8 provides that captains must take appropriate action to avoid collision. 33 C.F.R. § 83.08. Plaintiff's expert argued that the JUSTIN violated Rule 5 when it failed to hold up under the fleet until the VANPORT had passed.[74] Defendant's expert argued that the VANPORT violated Rule 5 when it failed to steer away from the JUSTIN in the minutes after the radio exchange.[75] Defendant's expert also argued that the

---

[74] Testimony of Samuel Schropp.
[75] Testimony of Gregory Smith.

VANPORT violated Rule 6 by increasing its speed after the radio exchange.[76] Finally, he argued that the VANPORT did not take appropriate action to determine whether a risk of collision existed and to avoid the collision under Rules 7 and 8, because the VANPORT continued to travel along the fleet edge of the channel.[77]

The Court has already determined what could have been done by each captain to avoid the collision. In accordance with these findings, neither captain violated Rule 5. Both captains kept a lookout and were aware of the other vessel's position before and during their radio exchange, as evidenced by their communication. The Court also finds that the captains kept a proper lookout after the radio exchange. But even if the captains had failed to keep a lookout after their exchange, their mistake would not have affected the outcome. The VANPORT was unable to turn away from the JUSTIN until the BEATRICE had fully passed it. And the river current prevented the JUSTIN from halting the top around maneuver once it was underway. Thus, once each captain committed to proceed in a manner consistent with his understanding of what the other captain was going to do, a proper lookout could not have averted the collision that the misunderstanding set in motion.

---

[76]   *Id.*
[77]   *Id.*

In addition, as already discussed, the VANPORT was not traveling at an unsafe speed. Captain Vidrine put the VANPORT in idle as soon as he reached an agreement with the BEATRICE, and he did not remove the vessel from idle until a minute before the collision. His increased speed was due to a fast river current. Finally, both captains violated Rules 7 and 8 for the reasons that the Court has already enumerated. The JUSTIN should have assessed the risk of collision and waited to perform the top around maneuver, or communicated his intent to turn in front of the VANPORT more clearly. The VANPORT should have told the JUSTIN not to top around before it had passed the JUSTIN. The Court therefore finds that these rules do not change the Court's conclusions about the nature of the parties' negligence.

### 3. *Negligence in Violating an Industry Custom or Practice*

Defendant's expert testified that Captain Jackson's exchange with the VANPORT established a top around agreement, and that the VANPORT's violation of the agreement's terms caused the collision.[78] A passing agreement of this kind must be established by facts in the record. *See* 2 Admiralty & Mar. Law § 14:3 (6th ed.) ("In order to rely on custom, a party should plead and prove it as a fact applicable in the particular instance.").

---

[78] *Id.*

The Court finds that defendant has not met its burden of establishing (1) that top around agreements are a recognized type of navigational agreement; (2) the requirements to form and execute a top around agreement; and (3) that a top around agreement of the kind defendant describes existed between the VANPORT and the JUSTIN.

First, defendants did not establish that "top around agreements," as a species of navigational agreement, exist as a matter of custom or practice in the maritime industry. The existence of such a maritime custom or practice was disputed at trial. While ship captains may make various types of agreements when a vessel plans to top around, defendant did not convincingly show that a "top around agreement" is universally recognized as a category of navigational agreement. Plaintiff's expert Samuel Schropp testified that, while top around maneuvers are common, and he was familiar with hold up agreements, he had never heard of a top around agreement before this case.[79] In addition, defendant's expert testified that an agreement was formed between the VANPORT and the JUSTIN in this instance, but he did not testify to the common characteristics of top around agreements in the industry. Nor did Captain Vidrine acknowledge his awareness of top around agreements as a category of navigational agreements. "As a general

---

[79] Testimony of Samuel Schropp.

matter, '[c]ourts do not favor giving effect to local customs involving deviations' from the rules of navigation, and they make an exception only when the customs 'are firmly established, and well understood.'" *Hal Antillen N.V. v. Mount Ymitos MS*, 147 F.3d 447, 451 (5th Cir. 1998) (quoting *The Giove*, 27 F.2d 331, 332 (5th Cir. 1928)). The Fifth Circuit has overturned a district court's finding that a custom existed when "[t]here [was] highly contradictory testimony concerning the existence or nonexistence of th[e] alleged custom in [the] waterway." *Id.* The Court therefore finds that defendant did not present sufficient proof of top around agreements as a practice known generally to seamen.

Even if top around agreements are a regular custom or practice of mariners on the Mississippi River, defendant did not establish that a top around agreement allowed it to top around in front of the VANPORT. Captain Jackson testified that the top around agreement allowed him to immediately move into the navigational channel and that the VANPORT was obligated to "stay clear" of the JUSTIN regardless of the JUSTIN's position.[80] Defendant's expert similarly testified that the agreement between the VANPORT and the JUSTIN mandated that the VANPORT "stay clear."[81] But

---

[80] Testimony of Billy Jackson.
[81] Testimony of Gregory Smith.

Captain Jackson never told Captain Vidrine that he was to stay clear while Captain Jackson topped around. Indeed, Captain Jackson made no indication of where, in relation to the VANPORT, he would top around.[82]

Nor did the defendant establish that a duty to "stay clear" is an implied aspect of all top around agreements, if top around agreements exist. Defendant's expert testified that when topping around, "[i]t is common . . . to [place] a radio security call to get any interested or concerned vessels in the area to respond," and to "make sure the traffic is clear [and] you have the room to . . . top around."[83] Defendant's expert also testified that the ordinary practice of seamen is to "give [a vessel topping around] plenty of room to accomplish that maneuver safely."[84] General practices of (1) placing security calls alerting traffic of an intent to top around, and (2) staying clear of vessels topping around, do not indicate that top around agreements always implicitly convey to an upstream vessel that it must stay clear while a downstream vessel performs a top around maneuver in front of it. Further, the defense expert's account of these duties was not confirmed by any other evidence in the record, nor has the Court been able to find any reference to a "top around agreement" in the case law. The Court therefore does not credit

---

[82] Joint Exhibit 7.
[83] Testimony of Gregory Smith.
[84] *Id.*

Captain Jackson's testimony that he was entitled to assume that the VANPORT would stay clear of him based on the alleged top around agreement.

Finally, even if defendant proved that top around agreements with the features it suggests exist in industry practice, defendant did not establish that such a top around agreement was formed between the VANPORT and the JUSTIN. Defendant provided no evidence of the words required to form a top around agreement. Captain Vidrine reasonably did not understand the exchange between the two vessels as an agreement that required him to yield.[85] Captain Vidrine had the right of way, and Captain Jackson's language indicated that he intended to turn behind the VANPORT. Captain Jackson's ambiguous language is not enough to constitute an offer for an agreement to be allowed to proceed first, especially given that he was in an unsafe position in front of oncoming traffic where other captains would not expect him to be topping around. Thus, the Court does not find that an agreement was formed because there was no mutual understanding between the two captains as to what had been agreed upon. An inexact exchange such as this one does not override the JUSTIN's obligation to yield to the VANPORT as the downbound vessel with the right of way under Rule 14(d).

---

[85]     Testimony of Matthew Vidrine.

*See In re Settoon Towing, LLC*, No. 14-499, 2016 WL 9447753, at *4-5 (E.D. La. Mar. 21,2016) (holding that release from a passing agreement did not allow a vessel to top around in violation of the Inland Rules); 33 C.F.R. § 83.14.

### E.    Allocation of Fault

When both parties have acted negligently, "[l]iability . . . must be apportioned according to the comparative fault of the parties." *Pennzoil*, 943 F.2d at 1472. "Apportionment is not a mechanical exercise that depends upon counting up the errors committed by both parties." *Stolt Achievement*, 447 F.3d at 370. Instead, a court must consider "the number and quality of faults by each party" as well as "the role each fault had in causing the collision." *Id.*

Here, while both parties are at fault, the JUSTIN played a larger role in causing the collision. The JUSTIN moved into the channel in front of downstream traffic without taking due care and in violation in Rule 14(d) and Rule 2, and Captain Jackson did not communicate his intent to move in front of the VANPORT. While the VANPORT shares fault in giving the JUSTIN permission to begin topping around, the JUSTIN was best positioned to know how long it would take for it to complete the maneuver, and how much space it would need. It therefore is primarily responsible for determining

whether it was safe to begin the top around while the VANPORT was upstream. Finally, the Court does not find that an agreement was established to permit the JUSTIN and its six barges to reverse directions in front of oncoming traffic.

The Court ultimately concludes that the JUSTIN initiated an unsafe maneuver in high current and congested waters, and it expected the other vessels in the river to make the situation work. The Court therefore finds Marquette, as the owner of the JUSTIN, 70% at fault, and it finds Deloach, the owner of the VANPORT, 30% at fault.

## III.   CONCLUSION

For the foregoing reasons, the Court finds that both captains were negligent in the January 26, 2016 collision. Defendant Marquette shall bear 70% of the total damages sustained by Ingram, and plaintiff Deloach shall bear the remaining 30% of the costs.

New Orleans, Louisiana, this __2nd__ day of April, 2019.

_Sarah Vance_
SARAH S. VANCE
UNITED STATES DISTRICT JUDGE